# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

MARY E. ROTH and MICHAEL A. ROTH, Individually and as Co-Executors of the Estate of CLETUS ROTH, ANNA M. ROTH, Individually, and BRADLEY E. ROTH, Individually,

    Plaintiffs,

vs.

THE EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY d/b/a GOOD SAMARITAN SOCIETY—GEORGE,

    Defendant.

No. C 15-4074-MWB

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION TO DISMISS OR STAY AND TO COMPEL ARBITRATION AND ORDER CERTIFYING QUESTIONS TO THE IOWA SUPREME COURT**

_____

## TABLE OF CONTENTS

*I.*     *INTRODUCTION* ............................................................................ *2*

*II.*    *LEGAL ANALYSIS* ........................................................................ *3*
    *A.*    *The Estate's Claims* ............................................................... *3*
    *B.*    *The Roth Children's Claims* ..................................................... *5*
        *1.*    *The effect of language in the arbitration clause* ................... *5*
        *2.*    *Theories to compel non-signatories to arbitration* ................ *6*
            *a.*    *Estoppel* ................................................................ *6*
            *b.*    *"Derivative" or "independent" nature of the consortium claims* ................................................. *8*
    *C.*    *Certification Of Questions To The Iowa Supreme Court* .............. *10*
    *D.*    *Dismissal Or Stay?* ............................................................... *12*

*III.*   *CONCLUSION* ............................................................................ *12*

## I.  INTRODUCTION

This case arises from alleged negligent, grossly negligent, or reckless treatment and dependent adult abuse of Cletus Roth, while he was a resident in the defendant's nursing home; breach by the nursing home of a contract entered into by Cletus Roth's son Michael for Cletus's care; and Cletus's adult children's loss of parental consortium. It is before me on the September 22, 2015, Combined Motion To Dismiss Or Stay The Proceedings And To Compel Arbitration (Combined Motion) (docket no. 6), as subsequently supplemented, by defendant The Evangelical Lutheran Good Samaritan Society d/b/a Good Samaritan Society—George (Good Samaritan).

Good Samaritan's original Combined Motion was premised on Good Samaritan's understanding that Michael Roth had falsely represented that he had the healthcare and financial power of attorney for his father when he signed an Admission Agreement on Cletus's behalf.  That Admission Agreement included an arbitration provision (called "Resolution Of Legal Disputes") that the signatory could accept or decline without affecting Cletus's admission to the nursing home.  On October 1, 2015, however, Good Samaritan filed a motion (docket no. 10) to supplement its Combined Motion, based on initial disclosures by the plaintiffs (collectively the Roths) that demonstrated that Michael Roth did have general and healthcare powers of attorney for Cletus Roth, jointly or separately, with Mary Roth, at the pertinent time.  Good Samaritan requested and was granted time to supplement its Combined Motion in light of the new information.  *See* Order (docket no. 11).  Good Samaritan filed its Supplement To Combined Motion To Dismiss Or Stay The Proceedings And To Compel Arbitration (docket no. 12) on October 13, 2015.  The Roths filed their Resistance (docket no. 13) on October 30, 2015, and Good Samaritan filed its Reply (docket no. 14) on November 5, 2015.  Notwithstanding

the Roths' requests for discovery and a hearing, I conclude that Good Samaritan's Combined Motion, as supplemented, is fully submitted on the parties' written submissions.

## II. LEGAL ANALYSIS
### A. *The Estate's Claims*

Indeed, I find that the question of whether I must compel arbitration *of the estate's claims* in this case is settled, much more simply and directly than the parties argue, simply by reference to the arbitration provision in the Admission Agreement. In pertinent part, that arbitration provision states, in bold font,

> **The Parties expressly agree that the Arbitrator shall have exclusive authority to resolve any disputes related to the existence and/or enforceability of this Resolution of Legal Disputes provision, including but not limited to any claim that all or any part of this Resolution of Legal Disputes provision is void or voidable.**

Good Samaritan's Combined Motion, Exhibit A (docket no. 6-2), 15. As the parties acknowledge in their extensive briefing, the United States Supreme Court has explained, "The question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986), with emphasis added in *Howsam*). Notwithstanding the portion of the arbitration provision quoted above, which on its face unmistakably provides that questions of arbitrability are for the arbitrator, the Roths rely on the *presumption* that arbitrability is to be determined by the court, citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995). They also argue that issues concerning the "validity" of the arbitration agreement are always "threshold questions" for the court to decide.

3

These arguments are not enough to require me to decide any question of arbitrability or validity in this case, in light of the language of the arbitration clause that unmistakably provides that such questions are for the arbitrator. *Howsam*, 537 U.S. at 83.

This case contrasts sharply with the circumstances in *Nebraska Machinery Company v. Cargotec Solutions, L.L.C.*, 762 F.3d 737 (8th Cir. 2014), a case in which the Eighth Circuit Court of Appeals addressed the resisting party's contention that, despite certain language in the arbitration provision, "validity" issues still belonged to the court. In that case, the court concluded that the parties had not eliminated the presumption of judicial determination of all "threshold questions" simply by pointing to the invocation of the rules of the American Arbitration Association in the arbitration provision. 762 F.3d at 740-41 and n.2. The court explained,

> Cargotec relies on the disputed arbitration agreement itself in arguing that the parties intended to submit the present case to an arbitrator. Cargotec insists that because the arbitration provision incorporates the AAA's Commercial Rules of Arbitration, which vests an arbitrator with authority to determine its own jurisdiction, an arbitrator must determine arbitrability. In *Fallo v. High–Tech Institute*, we held that an arbitration provision that incorporated the AAA Rules was "a clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court." 559 F.3d 874, 878 (8th Cir.2009). However, *Fallo* did not address the threshold question we now confront: whether the arbitration agreement itself is valid. Thus, Cargotec's argument puts the cart before the horse, as it presumes the arbitration provision formed part of the contract at issue.

*Nebraska Machinery*, 762 F.3d at 741 n.2.

Unlike the situation in *Nebraska Machinery*, the arbitration provision in the Admission Agreement, here, does more than simply vest the arbitrator with authority to

4

determine its own jurisdiction. Instead, it vests the arbitrator with the "exclusive authority to resolve any disputes related to the existence and/or enforceability of this Resolution of Legal Disputes provision," as well as "any claim that all or any part of this Resolution of Legal Disputes provision is void or voidable." Such authority plainly includes the authority to resolve the "threshold questions" of validity raised by the Roths, based on their arguments concerning the circumstances in which Michael Roth signed, and the genuineness of his signatures on, the arbitration provision and the Admission Agreement, as well as "threshold questions" concerning purported "unconscionability" of the arbitration provision. Here, compelling arbitration of the estate's claims does not "put the cart before the horse," *compare id.*, because the arbitration provision unmistakably gives the arbitrator the authority to drive the horse and cart. Thus, the estate's claims must be submitted to arbitration.

### B. The Roth Children's Claims
#### 1. *The effect of language in the arbitration clause*

Whether I must compel arbitration of Cletus Roth's adult children's claims for loss of parental consortium, *see* State Court Petition, Count IV (docket no. 3), is a considerably more complicated question. The arbitration provision purports to "bind[ ] all parties whose claims may arise out of or relate to treatment or service provided by the center including any spouse or heirs of the Resident," and provides that "[t]he issue of whether a Party's claim(s) is subject to arbitration under this Resolution of Legal Disputes provision shall be decided by the arbitrator." Good Samaritan's Combined Motion, Exhibit A (docket no. 6-2), 14. While this provision purportedly requires arbitration of the Roth children's consortium claims, it is an oft-repeated principle of arbitration law "that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Howsam*, 537 U.S. at 83

(quoting *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 1409 (1960)). The Roth children are correct that none of them signed the arbitration agreement in their individual capacities or otherwise agreed to arbitration of their individual claims. Thus, the first question concerning arbitration of the loss of consortium claims is whether Good Samaritan, as a signatory to the arbitration agreement, can compel non-signatories, the Roth children, to arbitrate the loss of consortium claims.

### 2. *Theories to compel non-signatories to arbitration*

As the Eighth Circuit Court of Appeals has explained,

> "[A] willing signatory [here, Good Samaritan] seeking to arbitrate with a non-signatory [here, the Roth children] that is unwilling must establish at least one of the five theories described in *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir.1995)." *CD Partners, LLC v. Grizzle*, 424 F.3d 795, 799 (8th Cir.2005), *quoting Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131–32 (2d Cir.2003). Those five theories are (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *Thomson–CSF*, 64 F.3d at 776.

*Reid v. Doe Run Resources Corp.*, 701 F.3d 840, 846 (8th Cir. 2012); *see also Bank of America, N.A. v. UMB Fin. Servics, Inc.*, 618 F.3d 906, 912 (8th Cir. 2010) ("'[T]raditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel[.]'" (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)).

#### a. *Estoppel*

In *Reid*, the court described two forms of "direct benefits estoppel": (1) where the non-signatory knowingly seeks and obtains "direct benefits" from the contract containing the arbitration clause, and (2) where the non-signatory seeks to enforce the terms of the contract containing the arbitration clause or asserts claims that must be

determined by reference to the contract containing the arbitration clause. *Id.* Good Samaritan relies on the second form.[1] Good Samaritan asserts that several claims in the Roths' Complaint expressly rely on provisions of the Admission Agreement, but that contention is unavailing, because Good Samaritan has not demonstrated that the Roth children could assert any claims at issue in this case except loss of consortium in their individual capacities. The Roth children's individual claims of loss of consortium *nowhere* rely on the terms of the Admission Agreement. Rather, they expressly rely only on the negligence of Good Samaritan as the cause of damages that they have suffered from the loss of services, companionship, society, and support of Cletus Roth. *See* State Court Petition, Count IV.

Good Samaritan's reliance on *PRM Energy Systems, Inc. v. Primenergy, L.L.C.*, 592 F.3d 830 (8th Cir. 2010), for "alternative estoppel" is misplaced for at least two reasons. First, PRM involved a *non-signatory's* attempt to compel a *signatory* to arbitrate the *signatory's* claims, which is the reverse of the situation, here. 592 F.3d at 835. Second, the claims that are compelled to arbitration under "alternative estoppel" are claims that are "so intertwined *with the agreement containing the arbitration clause* that it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement." *Id.* (emphasis added). As explained, just above, the Roth children's loss of consortium claims do not rely on and are not intertwined with the Admission Agreement containing the arbitration provision, but rely exclusively on the alleged negligence of Good Samaritan.

---

[1] Good Samaritan does not rely on the first form and could not persuasively do so. The Roth children are not direct beneficiaries of the terms of the Admission Agreement, which was for Cletus's care—*i.e.*, Cletus was the third-party beneficiary who directly received the benefits of nursing home care.

### b. *"Derivative" or "independent" nature of the consortium claims*

Good Samaritan shoots nearer the mark when it argues that the Roth children's loss of consortium claims should also be sent to arbitration, because their loss of consortium claims are "derivative" of the estate's claims. The Roth children counter that their loss of consortium claims are "independent" of the estate's claims. Good Samaritan has not cited, and I have not found, any decisions of Iowa state courts clearly describing adult children's loss of consortium claims as "derivative." What I have found is that, some twenty-five years ago, the Iowa Supreme Court explained that it has modified its description of such claims as "independent":

> In October of 1981, this court, in a plurality decision, recognized a child's independent cause of action for loss of parental consortium. *Weitl v. Moes*, 311 N.W.2d [259,] 270 [(Iowa 1981)]. Since then, we have considerably modified this rule. We rejected the independent cause of action concept, holding instead that this cause of action was derived from Iowa Code section 613.15 and was to be commenced by the injured parent or the parent's estate. *Audubon-Exira Ready Mix, Inc. v. Ill. Cent. Gulf R.R.*, 335 N.W.2d 148,152 (Iowa 1983); *see also Madison v. Colby*, 348 N.W.2d 202, 208 (Iowa 1984). However, we retained the ownership of the proceeds in the child. *Audubon-Exira*, 335 N.W.2d at 152; *Beeck v. S.R. Smith Co.*, 359 N.W.2d 482,486 (Iowa 1984). We also tempered the requirement of the proper party to bring the action by acknowledging that it may not always have been feasible for a parent or parent's estate to bring the action because *Weitl* had not yet been decided. *Beeck*, 359 N.W.2d at 486; *Madison*, 348 N.W.2d at 209 (if action brought separately, the burden is on the consortium claimant to show joinder was not feasible); *see also Nelson v. Ludovissy*, 368 N.W.2d 141, 146 (Iowa 1985) (adult children may bring the

action if it is impossible, impractical or not in the child's best interest for the parent to maintain the action).

*Roquet by Roquet v. Jervis B. Webb Co.*, 436 N.W.2d 46, 47 (Iowa 1989);[2] *see also Nelson*, 368 N.W.2d at 146 (also noting that § 613.15 "does not indicate any distinction between adult children and minor children in the application of those provisions of section 613.15 which govern who shall bring the action[,] [n]or is any distinction between adult children and minor children recognized for this purpose in our later decision of *Madison v. Colby*, 348 N.W.2d 202 (Iowa 1984), which approves the injured parent bringing the statutory action for loss of services, although the recovery belongs to the child").

What is not entirely clear to me about § 613.15 is whether "any action for damages" in § 613.15 refers to an action in any tribunal, whether judicial or arbitral. The later reference in the statute to recovery of damages "in such sum as the jury deems proper" could suggest that the scope of the statute is limited to *judicial* actions. On the

---

[2] IOWA CODE § 613.15, then and now, provides as follows:

> In any action for damages because of the wrongful or negligent injury or death of a woman, there shall be no disabilities or restrictions, and recovery may be had on account thereof in the same manner as in cases of damage because of the wrongful or negligent injury or death of a man. In addition she, or her administrator for her estate, may recover for physician's services, nursing and hospital expense, and in the case of both women and men, such person, or the appropriate administrator, may recover the value of services and support as spouse or parent, or both, as the case may be, in such sum as the jury deems proper; provided, however, recovery for these elements of damage may not be had by the spouse and children, as such, of any person who, or whose administrator, is entitled to recover same.

other hand, one could reasonably read the statute to refer to "any action" in any tribunal. One could also reasonably conclude that the fact that the estate must arbitrate family members' loss of consortium claims, based on a proper signatory's agreement to an arbitration provision, is not a circumstance that makes it "impossible, impractical, or not in the best interest" of the family members for the estate to assert those claims. *Nelson*, 368 N.W.2d at 146 (adult children may bring the action if it is impossible, impractical, or not in the child's best interest for the parent to maintain the action). In light of the uncertainty about the proper construction of § 613.15, the unanswered questions are the following: (1) Does IOWA CODE § 613.15 require that adult children's loss of parental consortium claims be arbitrated, when the deceased parent's estate's claims are otherwise subject to arbitration? (2) Does the fact that a deceased parent's estate's claims are subject to arbitration establish that it is impossible, impracticable, or not in the best interest of the decedent's adult children for the decedent's estate to maintain their claims for loss of parental consortium, such that the loss of consortium claims can be maintained separately in court, notwithstanding that the estate's claims must be arbitrated?

### C. *Certification Of Questions To The Iowa Supreme Court*

Although none of the parties has requested that I do so, I believe that the appropriate course is to certify the questions set out in the previous paragraph to the Iowa Supreme Court pursuant to IOWA CODE § 684A.1 and N.D. IA. L.R. 83. As the United States Supreme Court has recognized,

> Certification procedure . . . allows a federal court faced with a novel state-law question to put the question directly to the State's highest court, reducing the delay, cutting the cost, and increasing the assurance of gaining an authoritative response.

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 76 (1997); *see Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (by certifying a question of state law, the federal court may save "time, energy and resources and hel[p] build a cooperative judicial federalism"). Thus, "[t]aking advantage of certification made available by a State may 'greatly simplif[y]' an ultimate adjudication in federal court." *Arizonans for Official English*, 520 U.S. at 76 (citing *Bellotti v. Baird*, 428 U.S. 132, 151 (1976)). Whether a federal district court should certify a question of state law to the state's highest court is a matter committed to the district court's discretion. *Schein*, 416 U.S. at 391 ("[Certification's] use in a given case rests in the sound discretion of the federal court."); *Babinski v. American Family Ins. Group*, 569 F.3d 349, 353 (8th Cir. 2009) ("'Whether a federal court should certify a question to a state court is a matter of discretion.'" (quoting *Johnson v. John Deere Co.*, 935 F.2d 151, 153 (8th Cir. 1991)).

Here, I find that the questions identified in the preceding section involve matters of Iowa law best answered, in the first instance, by the Iowa Supreme Court. I also find that consideration of pertinent factors, *see Hagen v. Siouxland Obstetrics & Gynecology, P.C.*, 964 F. Supp. 2d 951, 961 (N.D. Iowa 2013), warrants certification of the questions identified above. Specifically, the questions identified above are not clearly settled by—or even addressed—in Iowa state court rulings; these questions are increasingly likely to recur as arbitration is becoming more prevalent; and the early stage in the litigation in which this question arises—with no substantial investment in discovery by the parties or investment of judicial resources in deciding legal questions—suggests that the litigants will suffer little prejudice from certification of these questions, while improvidently compelling or denying arbitration of the loss of consortium claims could prejudice the rights of one or another of the parties. *Id.*

11

### D. *Dismissal Or Stay?*

The parties agree that, if I compel some or all of the claims at issue to arbitration, I should, at the very least, stay this case. The Roths specifically argue *against* a dismissal. I conclude that, while I will compel arbitration of the estate's claims at this time, I will stay the Roth children's loss of consortium claims pending answers to the certified questions by the Iowa Supreme Court. A stay is also appropriate where, under the arbitration provision at issue, the arbitrator has the exclusive authority to address threshold questions of arbitrability, including validity, and—at least theoretically—the arbitrator could conclude that the arbitration agreement is invalid, which would return all of the claims at issue to this court. While I will compel the parties to arbitration of the estate's claims, I will leave to them whether to proceed immediately to arbitration of those claims prior to receiving answers to the certified questions concerning whether the loss of consortium claims should also be brought by and arbitrated with the estate's claims.

### III. CONCLUSION

Upon the foregoing, Good Samaritan's September 22, 2015, Combined Motion To Dismiss Or Stay The Proceedings And To Compel Arbitration (Combined Motion) (docket no. 6), as subsequently supplemented in its October 13, 2015, Supplement To Combined Motion To Dismiss Or Stay The Proceedings And To Compel Arbitration (docket no. 12), is **granted**, to the following extent,

    1.    The parties are **ordered to arbitration**, pursuant to the arbitration provision in the Admission Agreement, as to *the plaintiff estate's claims* in the plaintiffs' Complaint, but the parties may decide for themselves whether to proceed immediately to arbitration of those claims or to await answers to the questions certified, below, before doing so; and

2. The proceedings in this court, on *all* issues, in their entirety, are **stayed** pending answer to the questions certified to the Iowa Supreme Court, below.

3. I hereby certify the following questions to the Iowa Supreme Court:

a. Does IOWA CODE § 613.15 require that adult children's loss of parental consortium claims be arbitrated, when the deceased parent's estate's claims are otherwise subject to arbitration?

b. Does the fact that a deceased parent's estate's claims are subject to arbitration establish that it is impossible, impracticable, or not in the best interest of the decedent's adult children for the decedent's estate to maintain their claims for loss of parental consortium, such that the loss of consortium claims can be maintained separately in court, notwithstanding that the estate's claims must be arbitrated?

The Clerk of Court shall forward this order to the Iowa Supreme Court under official seal as required under Iowa Code § 684A.4.

**IT IS SO ORDERED**.

**DATED** this 4th day of December, 2015.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA